IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Wesley J. Gibson,                    )
                                     )
          Plaintiff,                 )
                                     )
                                     )
     v.                              )   No. 20-cv-1069
                                     )
                                     )
Chubb National Insurance             )
Company,                             )
                                     )
          Defendant.                 )

Memorandum Opinion and Order

Plaintiff Wesley J. Gibson, through a single-member LLC, owns a large property located at 26 Pine Lake Road in Carbondale, Illinois known as "Pine Manor." ECF No. 118 ¶ 6. On October 22, 2019, a major fire occurred that damaged the property and its contents. ECF No. 116 ¶ 39. Pine Manor was insured under a "Masterpiece" homeowner's insurance policy issued by Defendant Chubb National Insurance Company ("Chubb"). *See* ECF No. 1-1. Chubb promptly paid Mr. Gibson $8,793,100, the coverage limit for damage to the dwelling under the policy. ECF No. 118 ¶ 37. Chubb, however, took the position that it was liable for coverage of the contents of Pine Manor only up to a $25,000 limit for "business property" because Pine Manor "was operated as a luxury bed and breakfast and event venue" and its contents were used for that

business.  ECF No. 102-20 at 5.  Mr. Gibson brought the instant lawsuit seeking payment from Chubb for the damaged contents of Pine Manor.  The parties have now filed cross-motions for summary judgment.  ECF Nos. 97, 101.  For the reasons that follow, Mr. Gibson's motion for summary judgment [101] is denied and Chubb's motion for summary judgment [97] is granted in part and denied in part.

I.

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "When, as here, cross-motions for summary judgment are filed, we look to the burden of proof that each party would bear on an issue of trial; we then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact."  *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (citing *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)).

Mr. Gibson, through an entity called Pine Manor LLC, purchased Pine Manor in 1998.  ECF No. 116 ¶ 5.  Mr. Gibson then renovated and personally furnished the property--a process which was completed by the end of 2002.  *Id.* ¶¶ 7-9.  The Gibson family tends to stay at Pine Manor approximately 70 nights each year.  ECF No. 118 ¶ 8.  Mr. Gibson (through various LLCs) also owns several other

2

properties within the vicinity of Pine Manor; the compound stretches over several blocks and multiple acres. *See* ECF No. 98-1 at 39:23-40:4.

Mr. Gibson operates a consulting firm known as Gibson Consulting G-4, LLC ("Gibson Consulting"). ECF No. 116 ¶¶ 14-15. Between 2016 and 2019, Gibson Consulting paid Pine Manor LLC a retainer--$70,000 per month in 2019--to secure the right to use Pine Manor and Mr. Gibson's other Carbondale properties as lodging for attendees of Gibson Consulting's seminars and trainings. ECF No. 118 ¶ 28. In the years preceding the fire, those events were common--in one year, Gibson Consulting may have hosted as many as 20 to 35 weeks of client trainings at the Carbondale properties. ECF No. 98-1 at 77:15-78:1; ECF No. 98-3 at No. 2. There were no private bedrooms at Pine Manor exclusively reserved for the Gibson family's use. ECF No. 118 ¶ 17. Although Mr. Gibson often slept in the master suite at Pine Manor during his stays in Carbondale, if there was a CEO in attendance at a training, Mr. Gibson would often vacate the master suite and sleep in the carriage house above the garage. ECF No. 98-1 at 79:16-23. Because of the Gibson Consulting retainer, Mr. Gibson repeatedly reported on his tax returns that Pine Manor and the other Carbondale properties had 365 "fair rental days" per year, while they were in "personal use" 0 days. ECF No. 98-7 at 35:12-37:7, 48:20-23, 58:4-12, 66:6-13.

3

In addition to the consulting trainings and seminars, Pine Manor hosted weddings--approximately 6 to 15 per year. ECF No. 118 ¶ 8. The Carbondale properties were also available to be rented out to the public for other purposes such as family reunions. *Id.* ¶ 14. For 2017 and 2018, lodging revenue for Pine Manor and Mr. Gibson's other Carbondale properties exceeded $1 million. *Id.* ¶ 29.

Pine Manor was featured on Mr. Gibson's professionally designed website for "Pine Manor Estates," which described Pine Manor as a "luxury country inn and resort" and allowed prospective guests to make reservation inquiries. *Id.* ¶ 10. The website advertised the property's amenities as including a "backdrop of fine art and artifacts from around the world." *Id.* Mr. Gibson maintained several business licenses for Pine Manor, including a bed-and-breakfast license, liquor licenses, and an Illinois business authorization. *Id.* ¶ 9. Mr. Gibson also employed a full-time property manager in charge of housekeeping, maintenance, landscaping, and weddings for the Carbondale properties. *Id.* ¶ 14. The property manager oversaw 8-10 full-time employees. *Id.* Like they would at a hotel, guests at Pine Manor received maid service and accessed their rooms with either a key card or with an electronic code delivered to their cell phones. *Id.* ¶ 20.

Guests at Pine Manor could use all the amenities and furnishings in the rooms in which they stayed. *Id.* ¶ 18. They

4

also enjoyed full access to all of Pine Manor's common areas, which included a kitchen, a library, office spaces, dining rooms, a poker room, a pub room, a movie room, and a billiards room. *Id.* They were permitted to access the nearby outdoor amenities as well, including the swimming pool, carriage house, boat dock, basketball and tennis courts, fireplace, and outdoor kitchen and bar. *Id.* ¶ 19. In fact, the only parts of Pine Manor that may have been inaccessible to guests were a small section of the wine cellar, a gun safe, and two locked closets in the master bedroom--although the property manager testified that at least one closet was not always kept locked. ECF No. 116 ¶ 10.

In 2010, Mr. Gibson procured from Chubb "Masterpiece" homeowner's insurance coverage for Pine Manor, as well as its contents, fine art, and jewelry. *Id.* ¶ 20; ECF No. 118 ¶ 31. In June 2017, an underwriter at Chubb named Bethany Maeder discovered, through online research, that Pine Manor was advertised as a bed and breakfast and a wedding venue. ECF No. 102-8 at 5. She expressed concern that Pine Manor might "no longer meet[] [Chubb's] definition for a home or incidental business property, therefore leaving a large gap in coverage." *Id.* She indicated that she would follow up and offer a quote for commercial coverage, writing: "I'm hoping after he understands our exclusions, he will want to move to a commercial policy." *Id.* Mr. Gibson, however, did not

move to a commercial policy, and the existing homeowner's policy was renewed twice--in 2018 and 2019. ECF No. 116 ¶ 22.

The subject insurance policy, policy number 13612330-01 effective June 11, 2019, provided $8,758,000 in deluxe dwelling coverage for Pine Manor. ECF No. 1-1 at 2. The policy also provided deluxe contents coverage for Pine Manor subject to a limit of $3,503,200. ECF No. 118 ¶ 33. That section of the policy provided Mr. Gibson with "coverage against all risk of physical loss to [his] contents anywhere in the world unless stated otherwise or an exclusion applies." ECF No. 1-1 at 46. "Contents" was defined as "personal property you or a family member owns or possesses." *Id.* Under the heading "Extra Coverages," the policy provided:

> **Business Property**
> We will pay up to $25,000 . . . for a covered loss to business property you own or possess. . . .
>
> "Business property" means:
> - furniture, supplies, equipment, inventory;
> - books, records; and
> - electronic data processing property,
>   used to conduct your business.

*Id.* at 49. "Business," in turn, was defined as "any employment, trade, occupation, profession, or farm operation including the raising or care of animals or any activity intended to realize a benefit or financial gain engaged in on a full-time, part-time or occasional basis." *Id.* at 48. Under the heading "Exclusions," the policy further provided: "**Business property.** We do not cover

6

any loss to business property other than as provided under Extra Coverages." *Id.* at 52.

The policy also contained separate Valuable Articles Coverage up to $264,480 for jewelry and $500,000 for fine arts ($50,000 maximum per item). *Id.* at 6. For loss of such valuables, Chubb agreed to "pay the amount required to repair or replace the property, whichever is less, without deduction for depreciation." *Id.* at 56.

On October 22, 2019, a major fire occurred that damaged Pine Manor and its contents. ECF No. 116 ¶ 39. Mr. Gibson submitted a claim seeking the full value of the Deluxe House Coverage, Deluxe Contents Coverage, and Valuable Articles coverage. ECF No. 118 ¶ 36.

Within days of the fire, a Chubb claims professional visited Pine Manor. *Id.* ¶ 38. Terrance Young, the Executive General Adjuster responsible for Mr. Gibson's claim, also visited the property on October 30, 2019 and met with Mr. Gibson, his attorney, and Globe Midwest Adjusters International ("Globe"), Mr. Gibson's retained adjuster. *Id.* Mr. Young walked the property and viewed the damage from the fire. *Id.* ¶ 39. Mr. Young also visited the Pine Manor website and reviewed customer reviews, as well as reviewed the details of Pine Manor's liquor liability and worker's compensation insurance. ECF No. 98-10 at 130:2-23.

Chubb promptly paid Mr. Gibson the coverage limit for the Deluxe House Coverage. ECF No. 118 ¶ 37. Accordingly, the Deluxe House Coverage is not at issue in this litigation. *Id.* In a November 20, 2019 letter, however, Chubb took the position that it was liable for coverage of the contents of Pine Manor only up to the $25,000 sublimit for "business property" because Pine Manor "was operated as a luxury bed and breakfast and event venue" and its contents were used for that business. ECF No. 102-20 at 5. Chubb initiated the instant lawsuit in February 2020. ECF No. 1.[1]

## II.

Before I turn to the parties' cross-motions for summary judgment, I will address a threshold issue. Chubb repeatedly asserted in its summary judgment briefs that Mr. Gibson claimed deductible business depreciation for the contents of Pine Manor on his tax returns. *See* ECF No. 128 at 7. Mr. Gibson claims that

---

[1] Chubb supplemented its Local Rule 56.1 statement of uncontested material facts approximately two months after filing. ECF No. 121. The supplement corrected a few typos and added a few exhibits that were referenced in the original statement of uncontested material facts but inadvertently excluded from the submission. *Id.* Mr. Gibson moved to strike Chubb's supplement. ECF No. 122. Because "the supplemental statement of material facts . . . does not raise new issues, but instead provides additional citations to the supplemented record for facts already asserted," Mr. Gibson's motion to strike [122] is denied. *See RBS Citizens, N.A. v. Ramzanali*, No. 09 C 05248, 2011 WL 2565941, at *1-2 (N.D. Ill. June 29, 2011). Mr. Gibson's similar, unopposed motion to amend its Rule 56 statement [124] is likewise granted.

this is false, and he moves for Rule 11 sanctions on the basis of Chubb's allegedly false statements.  ECF No. 128.

On Mr. Gibson's tax returns, he lists his claimed depreciation under certain category headings.  *See* ECF No. 99-3 at 21.  Some of the headings are descriptive--for example, "auto / transport equipment" or "pool."  *Id.* at 21-22.  Others seem to reference particular buildings in the Carbondale compound--for example, "Pine Manor VI" or "Pine Manor X."  *Id.* at 21.  There is no "Pine Manor" or "Pine Manor XXVI" category.  *Id.* at 21-23.  One category, however, is called "training center," under which Mr. Gibson claimed depreciation for furniture and other items.  *Id.* at 22-23.

When Mr. Gibson colloquially references the "training center," he is referring to a particular building located at 2 Pine Lake Drive.  *See* ECF No. 98-1 at 54:7-8.  The "training center" is a two-story log cabin structure with training facilities, three conference rooms, a kitchen and dining area, and storage.  *Id.* at 54:7-17.  Mr. Gibson argues that the "Training Center" category on his tax returns claims depreciation only for the training center property at 2 Pine Lake Drive and its contents.

Mr. Gibson's accountant, however, testified that the "training center" category on the returns was derived from a QuickBooks account with the same name, and that account included furniture from *multiple* buildings at the Pine Manor properties.

ECF No. 98-7 at 62:17-63:18. The accountant was not sure under which (if any) category Pine Manor fell, but he said it was his understanding that "the training center . . . was the one that had the fire." *Id.* at 46:14-19. Mr. Gibson's accountant, in other words, was arguably under the impression that the "training center" depreciation listed on the tax returns included the contents of the building that burned down--Pine Manor.

Under Federal Rule of Civil Procedure 11, factual contentions presented in written motions must generally have evidentiary support, Fed. R. Civ. P. 11(b)(3), and if they do not, "the court may impose an appropriate sanction," Fed. R. Civ. P. 11(c)(1). "The decision to impose sanctions is left to the discretion of the trial court in light of the available evidence" after "an objective inquiry into whether the party or his counsel should have known that his position is groundless." *Iosello v. Orange Lake Country Club Inc.*, No. 14 C 3051, 2015 WL 2330180, at *2 (N.D. Ill. May 14, 2015). "[S]anctions are to be imposed sparingly, as they can 'have significant impact beyond the merits of the individual case' and can affect the reputation and creativity of counsel." *Hartmarx Corp. v. Abboud*, 326 F.3d 862, 867 (7th Cir. 2003) (citation omitted).

Mr. Gibson has not carried the "high burden" to show that sanctions are warranted here. *See Iosello*, 2015 WL 2330180, at *2. While Mr. Gibson's accountant was not intimately familiar

with the buildings encompassing Mr. Gibson's Carbondale compound, his testimony did give Chubb's counsel reason to believe that Mr. Gibson depreciated the contents of Pine Manor under the heading "Training Center."[2]  I cannot conclude that sanctions are warranted under these circumstances.   Mr. Gibson's motion for Rule 11 sanctions [128] is denied.[3]

### III.

Turning now to the summary judgment motions, I consider Mr. Gibson's breach-of-contract claim in Count I.  Mr. Gibson alleged that Chubb breached the insurance contract by (1) categorizing the contents of Pine Manor as "business property" and accordingly limiting coverage to $25,000, and (2) failing to cover Mr. Gibson's lost fine art and jewelry under its valuable articles coverage. ECF No. 1 ¶¶ 75-88.   I first consider the "business property" aspect of the claim.

Before I assess whether the contents of Pine Manor were, in fact, "business property," however, I must interpret the policy's definition of that term.  "Under Illinois law, we give the terms of an unambiguous insurance policy their plain and ordinary meaning, reading the policy as a whole and considering 'the type

---

[2] Chubb did incorrectly assert that Mr. Gibson depreciated the mattresses in Pine Manor.  *See* ECF No. 118 ¶ 27; ECF No. 128 at 5. Chubb, however, later retracted this claim.  ECF No. 134 at 4 n.2.

[3] I considered Chubb's proposed surreply in opposition to the Rule 11 sanctions motion.  Chubb's motion to file a surreply [139] is therefore granted.

of insurance purchased, the nature of the risks involved, and the overall purpose of the contract.'" *Mkt. St. Bancshares, Inc. v. Fed. Ins. Co.*, 962 F.3d 947, 952 (7th Cir. 2020), *reh'g denied* (July 10, 2020) (citing *State Farm Mut. Auto. Ins. Co. v. Villicana*, 692 N.E.2d 1196, 1199 (Ill. 1998)). But "[i]f language in the insurance policy is subject to more than one reasonable interpretation, an ambiguity exists which must be resolved in favor of coverage." *F.D.I.C. v. Am. Cas. Co. of Reading*, 998 F.2d 404, 408 (7th Cir. 1993).

As noted above, the policy defined "business property" as follows:

> "Business property" means:
> - furniture, supplies, equipment, inventory;
> - books, records; and
> - electronic data processing property,
>   used to conduct your business.

ECF No. 1-1 at 49. The parties disagree as to whether "used to conduct your business" modifies each of the items on the list, or only the final item, "electronic data processing property." I conclude that it modifies each of the bullet-pointed items. If the parties had intended "used to conduct your business" to modify only the last item on the list, that phrase would likely have been included on the same line of text as the last item, rather than separated using the enter or return key. In the bullet-pointed definition of "electronic data processing property" that appears immediately below, the words stretch across the entire page,

12

suggesting that the drafter purposefully placed "used to conduct your business" on a new line here. ECF No. 1-1 at 49. Moreover, "used to conduct your business" is separated from the last item by a comma, further detaching the modifier from the last bullet. *See Elliot Coal Mining Co. v. Dir., Off. of Workers' Comp. Programs*, 17 F.3d 616, 630 (3d Cir. 1994) ("Th[e] use of a comma to set off a modifying phrase from other clauses indicates that the qualifying language is to be applied to all of the previous phrases and not merely the immediately preceding phrase."). And, importantly, considering that the purpose of this aspect of the policy was to cover the dwelling's contents, it would seem contrary to that purpose if all furniture were excluded from coverage under the business-property exception, rather than just furniture "used to conduct [the insured's] business."

Mr. Gibson argues that because the word "furniture" is included in a list of "distinctly commercial" items within the definition, it should be interpreted to refer only to "furniture of the type customarily used for commercial purposes (e.g., office furniture, storage or display shelves, a printer stand, etc.)." ECF No. 103 at 11. But that reading runs directly contrary to the policy's other terms. The definition of "business property," as noted above, refers to "furniture . . . used to conduct your business." ECF No. 1-1 at 49. "Business," in turn, is defined as "any employment, trade, occupation, profession, or farm operation

13

including the raising or care of animals or any activity intended to realize a benefit or financial gain engaged in on a full-time, part-time or occasional basis." *Id.* at 48. Business, in other words, is defined broadly--there is no indication that it is limited to business conducted from an office. It follows furniture meeting the definition of "business property" is not limited to office furniture.

The parties also dispute the meaning of "used to conduct your business." Chubb argues that the relevant inquiry is whether the property in question was used "primarily" for business. I disagree. The word "primarily" appears nowhere in the business-property definition, and in its absence, I decline to read it in. *See Kennedy v. Lumbermen's Mut. Cas. Co.*, 190 A.D.2d 1053, 1053-54 (N.Y. App. Div. 1993) (concluding lower court "erred in holding that [a] clause limiting coverage for property 'used at any time or in any manner for any business purpose' did not apply unless the 'primary purpose' of the property and its use was for a business purpose"). Indeed, a few lines below the definition of business property, the policy includes the following language: "'Business property' does not include any drones or similar unmanned device, *whether used in whole or in part in a business*." ECF No. 1-1 at 49 (emphasis added). The drafter would not have needed to exclude drones used "in part" for business if the definition of "business property" did not already include property

14

used for business only partially. I conclude that property "used to conduct your business" is precisely as it says--property that is used, whether partially or fully, to conduct the insured's "business" as defined in the policy.

Mr. Gibson argues that because the business-property provisions of the policy are listed under the heading "Extra Coverages," the $25,000 business-property coverage was "extra"--i.e., offered in addition to the general contents coverage. *See* ECF No. 103 at 10. But that interpretation is also belied by the terms of the policy as a whole. Business property is clearly listed in the policy's "Exclusions" section. *See* ECF No. 1-1 at 52. In that sense, the $25,000 coverage for business property *is* "extra"--i.e., above and beyond the $0 of coverage that would have been afforded under the terms of the policy including the exclusions.

With these issues of interpretation settled, I turn to the question of whether the contents of Pine Manor are properly considered "business property" under the policy. Chubb argues that Mr. Gibson is estopped from claiming that Pine Manor's contents were *not* business property because (1) Mr. Gibson claimed on his tax returns that Pine Manor and the other Carbondale properties had 365 "fair rental days" per year, while they were in "personal use" 0 days, and (2) he depreciated the contents of Pine Manor. *See* ECF No. 100 at 14-15. Mr. Gibson is barred from taking

15

a position that is inconsistent with his tax returns, Chubb argues, under the doctrine of quasi-estoppel. *Id.* at 14-16.

Under a quasi-estoppel theory, multiple courts have barred parties from taking a position contrary to that which they have asserted in their tax returns, reasoning that a party should not be "allowed to accept the benefits of a transaction or statute and then subsequently take an inconsistent position to avoid the corresponding obligations or effects." *Cent. States, Se. & Sw. Areas Pension Fund v. One Stop, Inc.*, No. 03 C 4414, 2007 WL 7705585, at *13 (N.D. Ill. July 18, 2007) (citing *In re Davidson*, 947 F.2d 1294, 1297 (5th Cir. 1991); *In re Robb*, 23 F.3d 895, 898 (4th Cir. 1994)). Other courts, however, have declined to apply quasi-estoppel and have, instead, considered the assertions in a party's tax returns as mere evidence of that party's intent. *See In re Sampson*, 997 F.2d 717, 724 n.6 (10th Cir. 1993); *In re Kritt*, 190 B.R. 382, 388 (B.A.P. 9th Cir. 1995). Even courts within this district have disagreed on the question of whether to apply tax quasi-estoppel. *Compare Cent. States*, 2007 WL 7705585, at *13 (barring defendant from asserting tax returns were incorrect under quasi-estoppel theory), *with Chi. Reg'l Council of Carpenters Pension Fund v. United Carpet, Inc.*, No. 18 C 4785, 2020 WL 3077541, at *4 (N.D. Ill. June 10, 2020) (refusing to apply tax quasi-estoppel theory to eliminate disputed issue), *and In re Sillins*, 264 B.R. 894, 898 (Bankr. N.D. Ill. 2001) (same).

16

Uniformly, however, courts apply tax quasi-estoppel only where the party has accepted a tax benefit based on its assertions in its tax returns. *See, e.g.*, *Chi. Regional*, 2020 WL 3077541, at *4 (declining to apply quasi-estoppel where it was "not clear what benefit Defendants received"). Here, there is no dispute that Mr. Gibson reported 0 days of personal use for Pine Manor and the other Carbondale properties, but it is not apparent that Mr. Gibson received a tax benefit from that assertion alone. To the extent Mr. Gibson depreciated the contents of Pine Manor based on those 0 days of personal use, that would undoubtedly constitute a tax benefit. But whether Mr. Gibson in fact depreciated the contents of Pine Manor remains a disputed issue of fact. Mr. Gibson's accountant's testimony that he thought the "training center" depreciation listed on the tax returns included the contents of the building that burned down was sufficient to avoid Rule 11 sanctions, but it does not establish that Mr. Gibson depreciated Pine Manor's contents as a matter of law. Because it is unclear that Mr. Gibson received a benefit from the tax assertions at issue, I decline to apply quasi-estoppel here. I may, however, consider Mr. Gibson's tax returns as evidence of his intent.

I turn to the merits, then, of whether the contents of Pine Manor were "business property" as defined by the policy. *See* ECF No. 1-1 at 49. As a preliminary matter, it seems clear that Pine Manor operated as a "business" according to the policy's

17

definition. In addition to weddings and other events, Pine Manor hosted multiple weeks of client trainings and seminars for Gibson Consulting each year, and Gibson Consulting paid a monthly retainer for that privilege. ECF No. 118 ¶¶ 8, 28. The lodging revenue for Pine Manor and the other Carbondale properties exceeded $1 million. *Id.* ¶ 29. The policy defines "business" as "any activity intended to realize a benefit or financial gain engaged in on a full-time, *part-time or occasional basis*." ECF No. 1-1 at 48 (emphasis added). Accordingly, even if Pine Manor had been in personal use for some proportion of each year--which is dubious given the Gibson Consulting retainer and the reported 0 days of personal use on Mr. Gibson's taxes--it would still qualify as a business under the policy.

The next question is whether the contents of Pine Manor were "furniture, supplies, equipment, inventory . . . used to conduct [Mr. Gibson's] business." ECF No. 1-1 at 49. I conclude that they were. It is clear that furnishings, décor, and amenities aid in the administration of any lodging or rental business. Indeed, Mr. Gibson advertised Pine Manor's "world-class amenities" amongst a "backdrop of fine art and artifacts from around the world" on its business website. ECF No. 118 ¶ 10. Guests at Pine Manor enjoyed full use of all the furnishings in their rooms, as well as access to Pine Manor's extensive common areas. *Id.* ¶ 18. Because the contents of Pine Manor were overwhelmingly used in furtherance

18

of the rental/lodging business, they were "business property" subject to the $25,000 limit.

Mr. Gibson did testify, however, that there were some small areas of Pine Manor that were not accessible to the guests that may have contained personal items--for example, locked closets in the master suite and a section of the wine cellar. *See* ECF No. 116 ¶ 10. Chubb disputes that some of these areas were kept locked and inaccessible. *Id.* If they were indeed inaccessible, however, the personal items in those areas would likely be considered contents not subject to the "business property" exclusion. Accordingly, with regard to any contents in those areas kept inaccessible to Pine Manor guests, Mr. Gibson's contents-coverage claim may proceed.

Mr. Gibson also claims that Chubb breached the insurance contract by failing to cover Mr. Gibson's lost fine art and jewelry under the policy's valuable articles coverage. ECF No. 1 ¶¶ 75-88. Neither party, however, appears to have moved for summary judgment on this aspect of the claim. *See* ECF No. 100 at 9 n.2; ECF No. 103 at 6-12. To the extent the parties did intend to move for summary judgment, the question of valuable articles coverage is mentioned only in passing in the briefing and statements of facts, and I conclude that neither party has met its burden to establish the applicability or inapplicability of that coverage as

a matter of law. Summary judgment is denied with respect to the valuable-articles-coverage aspect of the breach-of-contract claim.

For the foregoing reasons, Mr. Gibson's motion for summary judgment as to Count I is denied. Chubb's motion for summary judgment as to Count I is granted in part, but Mr. Gibson may continue to pursue his claim for contents coverage with respect to the areas of Pine Manor kept locked and inaccessible to guests, as well as his claim for valuable articles coverage.

IV.

Both parties have also moved for summary judgment on Count II, which asserts a violation of the Illinois Insurance Code, 215 Ill. Comp. Stat. 5/155. That section "provides that an award of attorneys fees and costs is appropriate if insurers' actions are 'vexatious and unreasonable.'" *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000) (citing 215 Ill. Comp. Stat. 5/155). Because it is "penal in nature," the statute must be strictly construed--"[a]ttorneys fees may not be awarded simply because an insurer takes an unsuccessful position in litigation, but only where the evidence shows that the insurer's behavior was willful and without reasonable cause." *Id.* (citing *Morris v. Auto-Owners Ins. Co.*, 606 N.E.2d 1299, 1305 (Ill. App. Ct. 1993)). "[A]n insurer's conduct is not vexatious and unreasonable if: (1) there is a bona fide dispute concerning the scope and application of insurance

20

coverage . . . ; (2) the insurer asserts a legitimate policy defense . . . ; (3) the claim presents a genuine legal or factual issue regarding coverage, . . . ; or (4) the insurer takes a reasonable legal position on an unsettled issue of law." *Id.*

Mr. Gibson argues that Chubb's actions were "vexatious and unreasonable" because (1) "Chubb's coverage position [with regard to contents coverage] is not based on the terms of the policy as written and was formulated as part of a deceptive scheme to evade coverage," ECF No. 120 at 14, and (2) Chubb did not sufficiently investigate the nature of the property destroyed within Pine Manor before rendering its coverage determination, ECF No. 103 at 12. The first argument is easily dismissed; I granted, in substantial part, summary judgment to Chubb on the breach-of-contract claim with regard to the contents coverage. "It is neither vexatious nor unreasonable to litigate a 'bona fide dispute concerning the scope and application of insurance coverage,' let alone to deny coverage based on a position that prevails." *PQ Corp. v. Lexington Ins. Co.*, 860 F.3d 1026, 1038 (7th Cir. 2017) (citation omitted).

Mr. Gibson's second argument fares no better. It is undisputed that Chubb performed an investigation: a claims professional inspected Pine Manor within days of the fire, and Mr. Young, an executive adjuster, visited the property, met with Mr. Gibson, his attorney, and his retained adjuster, and conducted an online investigation. ECF No. 118 ¶¶ 38, 39; ECF No. 98-10 at

130:2-23. Mr. Gibson offers only unsupported allegations that Chubb exercised bad faith in its investigation and ultimate denial of Mr. Gibson's claim. *See Sports Arena Mgmt., Inc. v. Great Am. Ins. Grp.*, No. Civ. A 06 C 0788, 2007 WL 684003, at \*4 (N.D. Ill. Mar. 1, 2007) (unsupported assertions of bad faith investigation did not preclude summary judgment for Section 155 claim); *Horning Wire Corp. v. Home Indem. Co.*, No. 91 C 6694, 1993 WL 11850, at \*7 (N.D. Ill. Jan. 14, 1993) (same). Summary judgment is granted in favor of Chubb on Count II.

V.

Chubb also moves for summary judgment on Count III, which claims a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. 505/1 *et seq.* "The elements of a claim under ICFA are: (1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010) (citing *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002)).

As spelled out in Mr. Gibson's response brief, the consumer fraud claim here "arises from Chubb's unfair and deceptive after-the-fact attempt to rewrite the insurance coverage it sold to Gibson." ECF No. 120 at 18. But "[a] claim that an insurer is

22

'lying after the fact to avoid paying [a] claim' amounts to no more than [a] claim for denial of benefits and breach of contract, and is preempted by [215 Ill. Comp. Stat. 5/155]." *Leona's Pizzeria, Inc. v. Nw. Nat'l Cas. Co.*, 203 F. Supp. 2d 930, 933 (N.D. Ill. 2002) (citing *Cramer v. Ins. Exch. Agency*, 675 N.E.2d 897, 905 (Ill. 1996)).

Mr. Gibson specifically disclaimed in his response brief that Count III was premised upon "Chubb s[elling] an insurance contract to Gibson with knowledge of a coverage 'gap' relating to Gibson's contents." ECF No. 120 at 18. Accordingly, any such claim is deemed abandoned. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003). But even if that claim were allowed to proceed, it would likely be unsuccessful. "Insured parties have the burden of knowing the contents of their insurance policies"; "[a]n insurer 'does not have the duty of reviewing the adequacy of an insured's coverage, even when it knows of facts that indicate that the coverage is inadequate.'" *Commonwealth Ins. Co. v. Stone Container Corp.*, 351 F.3d 774, 779-80 (7th Cir. 2003) (citation omitted). Accordingly, even if Chubb failed to disclose a "coverage gap" to Mr. Gibson, "such a nondisclosure does not provide a basis for liability under the Consumer Fraud Act." *Id.* at 780. Summary judgment is granted in favor of Chubb on Count III.

VI.

For the foregoing reasons, Mr. Gibson's motion for summary judgment [101] is denied. Chubb's motion for summary judgment [97] is granted in part and denied in part. Summary judgment is granted as to Counts II and III. Count I may proceed with respect to the claim for valuable articles coverage, as well as with respect to the claim for contents coverage limited to the contents of the areas of Pine Manor kept locked and inaccessible to guests.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: May 4, 2022